WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: 208.389.9000

WENDY S. HEIPT (pro hac vice pending)
wheipt@legalvoice.org
LEGAL VOICE
907 Pine Street, #500
Seattle, WA 98101
Telephone: 206.954.6798

KELLY O'NEILL, Bar No. 9303
koneill@legalvoice.org
LEGAL VOICE
P.O. Box 50201
Boise, ID 83705
Telephone: 208.649.4942

JAMILA A. JOHNSON (pro hac vice
pending)
jjohnson@lawyeringproject.org
THE LAWYERING PROJECT
3157 Gentilly Blvd. #2231
New Orleans, LA 70122
Telephone: 347.706.4981

PAIGE SUELZLE (pro hac vice
pending)
psuelzle@lawyeringproject.org
THE LAWYERING PROJECT
2501 SW Trenton Street #1097
Seattle, WA 98106
Telephone: 347.515.6073

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LOURDES MATSUMOTO, NORTHWEST ABORTION ACCESS FUND, and INDIGENOUS IDAHO ALLIANCE,<br><br>Plaintiffs,<br><br>v.<br><br>RAÚL LABRADOR, in his capacity as the Attorney General for the State of Idaho, Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

## I. INTRODUCTION

Idaho has some of the most oppressive criminal abortion statutes in the United States. Its Total Abortion Ban, codified at Idaho Code § 18-622, was passed in 2020, prior to the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 597 U.S. ___ (2022), and "triggered" when the *Dobbs* decision overruled *Roe v. Wade*, 410 U.S. 113 (1973). Under Idaho's Total Abortion Ban, "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion." Idaho Code § 18-622(2). Idaho's Total Abortion Ban initially had no exceptions. Not for rape, or incest, or to save the life of the pregnant person. Those were only affirmative defenses. Idaho Code § 18-622(3).[1] A Total Abortion Ban in Idaho wasn't enough. Understanding that many of Idaho's neighboring states continue to recognize a person's right to control their reproductive health, that Idahoans in need of reproductive health care services that might include abortion health care would travel to these states, and that other Idahoans and out-of-state reproductive health advocacy organizations would assist Idahoans obtain lawful abortion health care outside of Idaho, the Idaho Legislature acted again.

This time, under the guise of protecting parents' rights (a selective rationale in Idaho at best),[2] the Idaho Legislature passed, and Governor Brad Little signed, a statute seeking to isolate minors from those who might help them access abortion health care.[3] Specifically, the legislature

---

[1] The Idaho Legislature amended Idaho Code § 18-622(3) in 2023 to make the affirmative defenses into exceptions. *See* 2023 Idaho Laws Ch. 298 (H.B. 374).

[2] In the 2023 session, the Idaho Legislature also passed, and Governor Little signed, H.B. 71, 67th Leg., which banned gender affirming medical care for transgender minors, even where a parent wanted their child to receive such medical care. Two families of transgender girls have sued the state alleging, among other claims, that it violates parental rights. *See* Audrey Dutton, *Families of Transgender Teen Girls Sue over Idaho's Ban on Gender Care for Youth*, Idaho Capital Sun (June 1, 2023), https://idahocapitalsun.com/2023/06/01/families-of-transgender-teen-girls-sue-over-idahos-ban-on-gender-care-for-youth/.

[3] 2023 Idaho Laws Ch. 310 (H.B. 242).

criminalized adults who help minors travel for abortion care, if the adult has the intent to conceal the abortion from a parent or guardian. Apparently aware that they can't make abortions — or receipt of medications used in medical abortions — that occur in other states unlawful, they instead made it unlawful to provide travel assistance within Idaho, including helping minors reach or cross Idaho's borders. They call it abortion trafficking. Ignoring that some of the minors may seek an abortion because they were sexually abused by a parent or guardian, that they have consulted with trusted adults who support their position, or that they are actual victims of human trafficking, they instead seek to stop pregnant minors from crossing state lines to receive abortion health care.

The statute is unconstitutional. It is poorly written. It is vague and unclear in the conduct it prohibits. It infringes on the right to interstate travel, which United States Supreme Court Justice Brett Kavanaugh expressly stated was not implicated by *Dobbs*. It infringes on the right to intrastate travel. It infringes on First Amendment rights to speak about abortion and to associate and to engage in expressive conduct, including providing monies and transportation (and other support) for pregnant minors traveling within and outside of Idaho to access out-of-state legal abortion care. Plaintiffs, by contrast, are an individual and two organizations that seek to assist Idaho minors obtain reproductive health care that is lawful outside of Idaho — abortion, which necessitates some form of travel within Idaho to reach its borders. They now bring this civil action for declaratory and injunctive relief and allege as follows:

## I. PARTIES

1.       Plaintiff Lourdes Matsumoto is an individual and a resident of Idaho. She is an attorney who routinely works with victims of domestic and sexual violence, including minors. Her work includes representing victims of sexual violence resulting in pregnancy. In her work with minors who become pregnant, and in her individual capacity, she would like to discuss abortion options and assist minors in getting abortions in states where abortion remains legal, including by

COMPLAINT FOR DECLARATORY JUDGMENT - 3
120228718.1 0099880-01499

transporting them or assisting them obtain transportation from Idaho to those states. Plaintiff Matsumoto fears prosecution under the Abortion Travel Ban.

2.     Plaintiff Northwest Abortion Access Fund ("NWAAF") is an abortion fund, made up of a working board, paid staff, and trained volunteers. NWAAF serves Idaho, Oregon, Washington, and Alaska. NWAAF helps people in these states access abortion care in various ways, including by transporting them across state lines. In the last year, NWAAF has provided assistance to 768 people in the Pacific Northwest. Idahoans made up 166 of that group, some of whom were Idaho minors.

3.     NWAAF, through its paid staff and trained volunteers, uses funds it raises to speak about abortion and to associate and to engage in expressive conduct, including providing monies and transportation (and other support) for pregnant minors traveling within and outside of Idaho to access out-of-state legal health care services, including abortion. NWAAF wishes to continue the assistance it provides but fears prosecution under the Abortion Travel Ban.

4.     Plaintiff Indigenous Idaho Alliance ("IIA") is an Idaho 501(c)(3) non-profit. IIA is organized to serve Indigenous peoples. This includes serving the five tribes whose traditional, usual, and accustomed lands encompass territory within Idaho, and whose traditional, usual, and accustomed lands are often recognized as transecting and incorporating land within the U.S. state/Canadian provincial boundaries of Washington, Idaho, Montana, Nevada, Utah, Wyoming, California, British Columbia, and Alberta. This area has one of the highest *per capita* populations of Indigenous people in the political boundaries of the United States. IIA's work also includes serving Indigenous people from other tribes across the U.S. who are in this area and far from their reservations and homelands.

5.      IIA Founder and Organizer tai simpson is a member of the Nimiipuu Nation, also called the Nez Perce Tribe of Idaho. The traditional, usual, and accustomed lands of the Nimiipuu people, like that of the other tribes whose territory encompasses land within Idaho, are often recognized as transecting and incorporating land within the U.S. state/Canadian provincial boundaries of Washington, Idaho, Montana, Wyoming, British Columbia, and Alberta.

6.      Through IIA and to serve its mission, Founder and Organizer tai simpson and others affiliated with IIA have assisted pregnant people, including minors in Idaho, access abortion care across the traditional, usual, and accustomed lands of the Indigenous people they serve. IIA wishes to continue to provide this assistance but fears prosecution under the Abortion Travel Ban.

7.       Defendant Raúl Labrador is the Attorney General for the State of Idaho and he is named in his official capacity. A state attorney general is the proper defendant where the state attorney general "intends either to enforce a statute or to encourage local law enforcement agencies to do so." *See Culinary Workers Union, Loc. 266 v. Del Papa*, 200 F.3d 614, 618–19 (9th Cir. 1999) (internal quotation marks and citation omitted). Defendant Labrador has authority to prosecute violations of Idaho Code § 18-623, at his sole discretion, if the authorized prosecuting attorney refuses to do so. Idaho Code § 18-623(4).

## II. JURISDICTION AND VENUE

8.      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343. This is an action to enforce civil and constitutional rights pursuant to 42 U.S.C. § 1983 and the United States Constitution.

9.      This Court has authority to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202, and 1343, Federal Rules of Civil Procedure 57 and 65, and the general legal and equitable powers of the Court.

10.     Venue is appropriate under 28 U.S.C. § 1391(b) because the Defendant engages in his official duties within this District and because a substantial part of the acts or omissions giving rise to this action arose from events occurring within this District.

### III. FACTUAL ALLEGATIONS

**A.      IDAHO ENACTS ITS ABORTION TRAVEL BAN.**

11.     "Abortion Trafficking" (the "Abortion Travel Ban") was first introduced in the Idaho Legislature on February 7, 2023, as Idaho House Bill 98, by Representative Barbara Ehardt. The bill was later amended and re-introduced as House Bill 242 ("H.B. 242") by Senator Todd Lakey and passed on March 30, 2023, with a 27–7–1 vote in the Idaho Senate and a 58–11–1 vote in the House.

12.     Representative Ehardt repeatedly referred to the bill as a "parents' rights" bill. During a March 27, 2023 Senate State Affairs Committee hearing, she testified, "[l]et me just say a couple things from my perspective, this is a parental rights bill, it really, it's a parental rights bill and as we just basically lay this out, this does have to do with abortion trafficking and that would be taking a minor from, without parental permission, it's all about parental permission, taking a minor from Idaho and trafficking that minor to another state to receive an abortion."

13.     H.B. 242 was signed into law on April 5, 2023, by Governor Brad Little. In a letter explaining his decision, Governor Little wrote that the law does not interfere with interstate travel; instead, it "seeks only to prevent unemancipated minor girls from being taken across state lines for an abortion without the knowledge and consent of her parent or guardian."[4]

---

[4] Ruth Brown, *'Abortion Trafficking' Bill Signed, Despite Washington Governor's Plea*, Idaho Reports (Apr. 5, 2023), https://blog.idahoreports.idahoptv.org/2023/04/05/abortion-trafficking-bill-signed-despite-washington-governors-plea/.

14.     In response to a request from Washington Governor Jay Inslee to veto the Abortion

Travel Ban, Idaho Governor Little again stated that the law does not criminalize interstate travel

for reproductive care, but rather prevents minors from traveling across state lines for an abortion

without parental consent.[5] Governor Little has further stated that Idaho has "the right and duty" to

make laws regarding abortion after the overturning of *Roe*.

15.     Due to its "emergency clause," H.B. 242 went into effect May 5, 2023, even though

it was not an official part of the Idaho Code until July 1, 2023. It is codified at Idaho Code § 18-

623.

16.     Idaho Code § 18-623 provides that:

> **(1)** An adult who, with the intent to conceal an abortion from the parents or
> guardian of a pregnant, unemancipated minor, either procures an abortion, as
> described in section 18-604, Idaho Code, or obtains an abortion-inducing drug for
> the pregnant minor to use for an abortion by recruiting, harboring, or transporting
> the pregnant minor within this state commits the crime of abortion trafficking. As
> used in this subsection, the terms 'procure' and 'obtain' shall not include the
> providing of information regarding a health benefit plan.
> "**(2)** It shall be an affirmative defense to a prosecution under subsection (1)
> of this section that a parent or guardian of the pregnant minor consented to
> trafficking of the minor.
> "**(3)** It shall not be an affirmative defense to a prosecution under subsection
> (1) of this section that the abortion provider or the abortion-inducing drug provider
> is located in another state.
> "**(4)** The Idaho attorney general has the authority, at the attorney general's
> sole discretion, to prosecute a person for a criminal violation of this section if the
> prosecuting attorney authorized to prosecute criminal violations of this section
> refuses to prosecute violations of any of the provisions of this section by any person
> without regard to the facts or circumstances.
> "**(5)** Any person who commits the crime of abortion trafficking, as provided
> in subsection (1) of this section, shall be punished by imprisonment in the state
> prison for no less than two (2) years and no more than five (5) years.

---

[5] While parental consent is an affirmative defense to prosecution under the Abortion Travel Ban,
nothing within the Abortion Travel Ban requires parental consent.

COMPLAINT FOR DECLARATORY JUDGMENT - 7

17.     Idaho Attorney General Raúl Labrador has made clear that he is willing to enforce Idaho criminal abortion statutes even where any abortion occurs in another state. In a now-"rescinded" legal opinion letter dated March 27, 2023, he stated that medical professionals who refer pregnant patients across state lines for either medical or chemical abortions violate Idaho Code § 18-622(2), Idaho's Total Abortion Ban.

18.     He also opined that the Abortion Travel Ban, which he noted provides him with the authority to prosecute violations, is constitutional. *See* Constitutionality of H.B. 242, Op. Att'y Gen. (Mar. 13, 2023).

**B.     THE ABORTION TRAVEL BAN HAS HARMFUL EFFECTS.**

19.     Idaho's draconian abortion statutes — the worst in the nation — have harmed Idahoans' reproductive health and their options for reproductive health care. Idaho trails far behind other states regarding its number of physicians per capita.[6] A January 2023 report by the Idaho Department of Health and Welfare shows that 98.2% of areas in Idaho have a primary care professional shortage.[7] Indeed, Idaho has the fewest active physicians in the United States.[8]

---

[6] *Understanding Idaho's Doctor Shortage*, Boise State Public Radio, https://bit.ly/3doQyFO (last visited Apr. 20, 2023).

[7] Idaho Dep't Health & Welfare, *Bureau of Rural Health & Primary Care Brief* (Jan. 2023), https://bit.ly/3QEEcrp.

[8] *See* Association of American Medical Colleges, *2021 State Physician Workforce Data Report* (Jan. 2022), https://store.aamc.org/downloadable/download/sample/sample_id/506/. Idaho is also the only state "without a legal requirement or specialized committee to review maternal deaths related to pregnancy." Natalie Schachar, *As US maternal mortality rates surge, Idaho abandons panel investigating pregnancy-related deaths*, Idaho Capital Sun (June 30, 2023), https://idahocapitalsun.com/2023/06/30/as-us-maternal-mortality-rates-surge-idaho-abandons-panel-investigating-pregnancy-related-deaths.

20.     Idaho is also one of the states most affected by the nationwide OB-GYN shortage.[9] Its abortion statutes criminalizing and chilling reproductive health care have OB-GYNs fleeing the state,[10] and at least two hospitals closing their labor and delivery departments.[11] This shortage is exacerbated by the lack of an OB-GYN residency program in Idaho,[12] meaning that every OB-GYN physician must be recruited to Idaho from out of state. Few are willing to work in a state where they face criminal prosecution for providing reproductive health care routine in other states.

21.     Some health care providers and clinics that provide a full array of reproductive health services, including abortion services, have modified their operations to comply with Idaho's Total Abortion Ban and still provide all appropriate reproductive health care services to persons in Idaho and the Pacific Northwest. Idaho's Total Abortion Ban has not changed the number of people seeking abortion care, it just changed where Idahoans must go to receive abortion care.

22.     For example, Planned Parenthood has opened a clinic in Ontario, Oregon, that provides full reproductive health services, including abortions. Ontario is 53 miles west of Boise

---

[9] U.S. Dep't of Health & Human Servs. et al., *Projections of Supply and Demand for Women's Health Service Providers: 2018-2030* (Mar. 2021), https://bit.ly/3PhGagh (projecting demand of OB-GYNs to exceed supply in Idaho).

[10] Kylie Cooper, *I Came to Provide Care for Complicated Pregnancies; I'm Leaving Because of Idaho's Abortion Bans*, Idaho Capital Sun (Feb. 10, 2023), https://idahocapitalsun.com/2023/02/10/i-came-to-provide-care-for-complicated-pregnancies-im-leaving-because-of-idahos-abortion-bans/.

[11] Press Release, Bonner General Health, Discontinuation of Labor & Delivery Services at Bonner General Hospital (Mar. 17, 2023), https://bonnergeneral.org/wp-content/uploads/2023/03/Bonner-General-Health-Press-Release-Closure-of-LD-3.17.2023.pdf; Press Release, Valor Health, Discontinuation of Labor & Delivery Services at Valor Health Hospital (Mar. 29, 2023), https://www.valorhealth.org/wp-content/uploads/2023/03/Press-Release-3.29-scaled.jpg (notice that as of June 1, 2023, Valor Health Hospital is no longer offering labor and delivery services).

[12] Kelcie Moseley-Morris, *Idaho Medical School Director to Budget Committee: Residencies Still a Challenge for Students*, Idaho Capital Sun (Jan. 27, 2023), https://bit.ly/43IenOC (noting Idaho lacks residencies in pediatrics and OB-GYN).

along Interstate 84, and the most practical way to get there is by car since there is no public transportation on that route.

23.     In addition to modifying their operations, many out-of-state health care providers who offer abortion services have seen a dramatic increase in the number of patients coming from Idaho for abortion care. Although there have been fewer abortions performed in Idaho since *Roe* was overturned, there has been an increase in abortions performed in Idaho's neighboring states, according to data from the Society of Family Planning.[13] Washington and Oregon saw an increase in abortions of 1,490 and 1,320, respectively.[14] Additionally, Nevada performed 2,580 more abortions than before.[15] Patients who reside in states where abortion care is severely restricted, or banned entirely, are forced to travel out of state to get the abortion care they need, which in turn places a strain on abortion care providers in states where abortion is legal.

24.     The inherent barriers of out-of-state travel coupled with the finite number of abortion providers has resulted in a significant strain for out-of-state providers. Planned Parenthood clinics in Central and Eastern Washington experienced an overall 56% increase in abortion patients coming from Idaho in 2023 compared to the year before.[16]

25.     This influx of patients traveling from Idaho seeking abortion care out of state is particularly heightened at Planned Parenthood clinic locations that offer in-clinic abortions (also known as surgical abortion) in addition to medication abortion. The Planned Parenthood clinic in Kennewick, Washington, which is 130 miles from Lewiston, Idaho, offers in-clinic abortion

---

[13] Danny Westneat, *In the WA v. Idaho Abortion Wars, Data Shows Idaho Is Losing*, Seattle Times (June 28, 2023), https://www.seattletimes.com/seattle-news/politics/in-the-wa-v-idaho-abortion-wars-data-shows-idaho-is-losing.

[14] *Id.*

[15] *Id.*

[16] *Id.*

services. That location saw a 4,450% increase in patients coming from Idaho within the first five months of 2023 (91 versus 2, respectively).[17]

26.     Minors will need to rely on trusted adults to drive them from Boise, or other cities in the Treasure Valley, to the Planned Parenthood clinic in Oregon, where minors may get an abortion without parental consent if they are over age 15, or to the Planned Parenthood clinic in Washington, where minors may get an abortion without parental consent. Minors may need to rely on trusted adults for advice regarding reproductive health options, including abortion, where those options are available and legal, and how and from whom to obtain transportation. Under Idaho Code § 18-623, the simple act of driving a minor to the Oregon border to get an abortion without the minor's parent or guardian knowing — or even providing advice on how to do that — could result in a mandatory minimum of two years and up to five years in prison.

27.     Pregnancy, childbirth, and parenting significantly impact an individual's physical and mental health, finances, and personal relationships. The decision to impact one's health with a pregnancy or to become a parent is extremely personal and permanent. An intimate decision of this magnitude must be left to the individual to determine without governmental interference, regardless of age. While parents and guardians most times will provide guidance to minors on these life altering decisions, not all minors have a strong, trusting, or stable relationship with a parent or guardian.

28.     Guided by their individual health needs, values, and circumstances, minors may seek guidance and help about abortion from other trusted adults for a variety of deeply personal reasons, including medical, familial, and financial concerns. Those reasons can include preserving

---

[17] Annette Carey, *Huge out-of-state surge in E. Washington abortions since Idaho, Texas bans*, Tri-City Herald (June 26, 2023), https://www.tricityherald.com/news/local/article276713511.html (noting increase in out of state abortions).

their health, financial concerns about the ability to work or go to school while pregnant or parenting, complicated family circumstances, or facts related to how the minor became pregnant. Without the ability to ask for help from their chosen trusted adult regarding their health, including the risks of continuing a pregnancy, minors will lose the right to make critical decisions about their health, bodies, and lives.

29.     If adults cannot assist minors in accessing safe abortion care out of state, and if minors cannot otherwise make the trip out of state because of uncertainty of how to access that care, the Abortion Travel Ban will force some minors to terminate their unwanted pregnancies outside a clinical setting, which would not be the preferred choice for some of these minors.

30.     Although many minors faced with an unintended pregnancy choose to involve their parents, many do not. There are minors who cannot or do not have access to their parents. There are minors who are afraid to anger or disappoint their parents, as well as those who face the threat of violence in their homes. For many minors, it is best to seek the help of a trusted adult who is not a parent or guardian. Young people are the ones in the best position to decide whom they trust to involve in their care. The Abortion Travel Ban will delay or prevent pregnant minors' access to abortion, which in turn will endanger their health and safety. Additionally, this law has and will continue to have a chilling effect on adults who are supportive of a young person's choice to have an abortion but are hesitant to help because they are concerned about going to prison.

31.     History has shown that requiring parental involvement for abortion care can increase the risk of harm or abuse, delay care, and lead minors to seek out dangerous alternatives.[18]

---

[18] Sophia Naide, *"Parental Involvement" Mandates for Abortion Harm Young People, But Policymakers Can Fight Back*, Guttmacher Institute (Feb. 19, 2020),

32.     Indeed, when abortion was a recognized constitutional right, Idaho, like other states, had judicial bypass statutes that allowed pregnant minors to obtain abortions in Idaho without parental consent to address precisely these potential harms. Idaho Code § 18-609A(1)(b) (2015). If a pregnant minor in Idaho is not in a situation where that minor can go to a parent, can no longer seek judicial bypass, and trusted adults cannot help without fear of prosecution, who can a pregnant minor turn to for help?

33.     The risk of abuse is especially acute for the Black, Indigenous, People of Color ("BIPOC"), and LGBTQ+ communities. There are already great healthcare disparities for historically marginalized communities in anti-abortion states. These states tend to limit access to health care, lack choices for effective birth control, and have ineffective and inadequate sex education curriculum in schools. The Abortion Travel Ban will result in a disproportionately negative impact on persons in these same marginalized groups, who will likely have the hardest time traveling to neighboring states to terminate pregnancies and may struggle to raise children they otherwise would not have chosen to have.

34.     Incidents of sexual violence go unreported to law enforcement at a significantly higher rate than other violent crimes, with less than 25% reported overall. While the reasons for a

https://www.guttmacher.org/article/2020/02/parental-involvement-mandates-abortion-harm-young-people-policymakers-can-fight-back#:~:text=Research%20also%20shows%20that%20most,people%20by%20delaying%20medical%20care.HYPERLINK     "https://www.reuters.com/article/us-health-teens-abortions/parental-notification-law-appears-to-limit-delay-abortions-dUSKBN1EJ0QO"https://www.reuters.com/article/us-health-teens-abortions/parental-notification-law-appears-to-limit-delay-abortions-idUSKBN1EJ0QO;

survivor to not report a sexual assault are varied, one of the top cited reasons is distrust and fear

of law enforcement, according to a poll conducted by the Rape and Incest National Network.[19]

35.     This distrust and fear of law enforcement is especially heightened in BIPOC

individuals whose communities experience a disproportionate rate of criminalization and police

harassment. A 2022 Gallup poll among American adults found that while 53% of White Americans

have "a great deal" or "quite a lot of confidence" in the police, only 30% of non-White Americans

share that same trust.[20]

36.     The distrust and fear of law enforcement from survivors of sexual violence, coupled

with that same distrust towards the police from BIPOC communities, significantly reduces the

likelihood that a minor from a BIPOC community who is pregnant as a result of sexual violence

will report this act to the police.[21]

37.     The Abortion Travel Ban also negatively and disproportionally impacts victims of

Intimate Partner Violence (IPV). Along with other forms of abuse, those enduring IPV are often

the subject of "reproductive coercion."[22] The American College of Obstetricians and

---

[19] Moira Donegan, '*Who Will Protect You from Rape Without Police?' Here's My Answer to That Question*, Guardian (June 17, 2020), https://www.theguardian.com/commentisfree/2020/jun/17/abolish-police-sexual-assault-violence.

[20] Laura Santhanam, *Two-Thirds of Black Americans Don't Trust the Police to Treat Them Equally. Most White Americans Do.*, PBS NewsHour (June 5, 2020), https://www.pbs.org/newshour/politics/two-thirds-of-black-americans-dont-trust-the-police-to-treat-them-equally-most-white-americans-do#:~:text=white%2Damericans%2Ddo-,Two%2Dthirds%20of%20black%20Americans%20don%27t%20trust%20the%20police,Most%20white%20Americans%20do.&text=Nearly%20half%20of%20black%20Americans,NewsHour%2DNPR%2DMarist%20poll); https://news.gallup.com/poll/394283/confidence-institutions-down-average-new-low.aspx

[21] Donegan, *supra* note 19.

[22] Elizabeth Miller et al., *Pregnancy Coercion, Intimate Partner Violence, and Unintended Pregnancy*, 81 Contraception 316, 316–17, note 23 (Jan. 29, 2010); Anne M. Moore et al., *Male Reproductive Control of Women Who Have Experienced Intimate Partner Violence in the United*

Gynecologists recognizes reproductive coercion as behavior that interferes with contraception use and pregnancy, often involving sabotage of contraceptive methods, sexual coercion, and pregnancy pressure.

38.    This can include hiding, withholding, or destroying oral contraceptives; breaking or damaging condoms on purpose; removing condoms during sex as an attempt to promote pregnancy; not withdrawing when that was the agreed upon method of contraception; removing vaginal rings, contraceptive patches, or intrauterine devices; and may include coercing a woman into sex, into unprotected sex, or into pregnancy. Additionally, it can include coercing a woman to have an abortion, or, conversely, taking steps to prevent a woman from having an abortion, such as restricting her travel or money in a way that would prevent her from accessing a lawful abortion.[23] Reproductive coercion can involve using rape to force victims into unwanted pregnancies to increase dependency and make it harder for the survivor to escape.

39.    When the National Domestic Violence Hotline surveyed over 3,000 women seeking help, more than 25% reported that their abusive partner sabotaged birth control and tried to coerce pregnancy.[24]

---

*States*, 70 Soc. Sci. & Med. 1737, 1738 note 23 (2010); *see also ACOG Committee Opinion No. 554: Reproductive and Sexual Coercion*, 121 Obstetrics & Gynecology 411, 411–15 (2013, *reaffirmed* 2022), https://www.acog.org/- /media/project/acog/acogorg/clinical/files/committee-opinion/articles/2013/02/reproductive-and-sexual-coercion.pdf.

[23] Ann L. Coker, *Does Physical Intimate Partner Violence Affect Sexual Health? A Systematic Review*, 8 Trauma, Violence, & Abuse 149, 151–53 (2007); *see also* Miller et al., *supra* note 22, at 319; Lauren Maxwell et al., *Estimating the Effect of Intimate Partner Violence on Women's Use of Contraception: A Systematic Review and Meta- Analysis*, 10 PLoS One 1 (2015); Moore et al., *supra* note 22; Sanctuary for Families, *Access to Abortion – A Lifeline for Survivors of Domestic Violence* (June 24, 2022), https://sanctuaryforfamilies.org/abortion-domestic-violence.

[24] Nat'l Domestic Violence Hotline, *1 in 4 Callers to the National Domestic Violence Hotline Report Birth Control Sabotage and Pregnancy Coercion* (Feb. 15, 2011), https://www.thehotline.org/news/1-in-4-callers-to-the-national-domestic-violence-hotline-report-birth-control-sabotage-and-pregnancy-coercion/; *see also* Heike Thiel de Bocanegra et al., *Birth*

**C.      PLAINTIFFS SEEK TO ASSIST MINORS IN OBTAINING LAWFUL ABORTION SERVICES.**

40.      The Plaintiffs are individuals and organizations with long histories of serving as trusted adults for minors who find themselves pregnant. They associate with pregnant minors as a show of solidarity, communicating a message to minors who find themselves pregnant. That message is often that minors are not alone. Plaintiffs' support also communicates a message to those who may seek to isolate and abuse minors that these minors will have the support of trusted adults.

41.      While each Plaintiff has a slightly different message and mission, each Plaintiff engages in protected First Amendment activities to share and support these messages and missions. Each Plaintiff also seeks to convey accurate and complete information about minors' lawful options when faced with a pregnancy. Such options could include where and how to obtain a lawful abortion; how to get there; support with childcare and other needs; payment for abortion health care services; food assistance in transit; and often involve offering to drive the minor wherever the minor needs to go, if that minor is without transportation, in order for the minor to investigate and follow through with a reproductive decision.

42.      Each of the Plaintiffs wishes to drive pregnant minors within the State of Idaho in furtherance of securing, for those who desire it, lawful abortion medical care, as one of many important services offered.

43.      Plaintiff Matsumoto is an attorney who works with survivors of domestic and sexual violence, including minor survivors. As a result of this violence, some of these survivors, including minors, have become pregnant. In both her professional and private capacities, she

---

*Control Sabotage and Forced Sex: Experiences Reported by Women in Domestic Violence Shelters*, 16 Violence Against Women 601 (2010).

wishes to assist those persons, including minors, access legal abortion services outside of Idaho. Although she is trained as a lawyer and has been practicing law for several years, she is unsure what conduct in that process would violate Idaho Code § 18-623. Plaintiff Matsumoto is driven by her belief in bodily autonomy for every citizen, including minors, and her words and actions seek to convey this belief.

44.     Plaintiff NWAAF is a non-profit entity comprised of a working board, paid staff, and trained volunteers that provides emotional, financial, logistical, practical, and informational assistance to those who may become pregnant and need or choose to consider abortion as an option. NWAAF serves Idaho, Oregon, Washington, and Alaska. It is the only independent abortion fund in the Pacific Northwest. NWAAF's assistance includes the provision of travel funds, travel logistics and organization, and actually driving patients to abortion providers. NWAAF's work and travel assistance extends to minors, including driving minor patients to abortion providers.

45.     NWAAF's work includes booking and directly paying for bus tickets, plane tickets, and ride shares, as well as providing adult volunteers to drive patients, including minor patients, to abortion appointments in states where abortion is legal. NWAAF also provides food assistance, funding to abortion providers for their work, and lodging assistance. NWAAF provides this assistance to both adults and minors in the State of Idaho.

46.     In the last year, NWAAF has provided this assistance to 768 people in the Pacific Northwest. Idahoans made up 166 of that group, some of whom were Idaho minors.

47.     When transporting or facilitating transportation for minors, NWAAF does not seek or obtain parental consent. Parents and guardians may or may not know about or approve of NWAAF's support of these minors.  Idaho Code § 18-623 directly impacts the mission and the work of NWAAF.

48.     As NWAAF noted after Governor Little signed H.B. 242 into law, "Many minors do not have supportive or safe parents or guardians in their lives who they can ask to help them get an abortion. It's remarkable that lawmakers believe that young Idahoans don't have the capacity to make reproductive healthcare choices for themselves or deserve bodily autonomy, but believe that those same young people should have the capacity to raise and care for children on their own, without any major social or economic support."

49.     NWAAF wishes to continue funding legal, out-of-state abortions for pregnant minor Idahoans, including by directly paying and/or reimbursing out-of-state licensed providers of abortion services and providing financial aid to pregnant minor Idahoans for that purpose.

50.     NWAAF wishes to continue providing informational materials and planning assistance (such as organizing and funding transportation and lodging) to pregnant minor Idahoans for obtaining legal, out-of-state abortions.

51.     NWAAF wishes to continue transporting pregnant minor Idahoans to out-of-state licensed providers of safe, legal abortions.

52.     NWAAF's working board, paid staff, and trained volunteers are concerned that continuing these efforts may subject them to prosecution under Idaho Code § 18-623.

53.     Among the priorities of IIA is seeking justice for the Missing and Murdered Indigenous People (MMIP) and their families. IIA is aware that in the United States, Indigenous women and girls are the victims of gender-based violence at a statistical rate twice that of Anglo-American women and girls.

54.     In the experience and observations of IIA, unwanted pregnancy or coercive pregnancy is often the result of the high rate of gender-based violence, which includes rape, experienced by Indigenous women and girls. The Indigenous women and girls who face unwanted

and coerced pregnancy are then often victims of further violence to conceal the crime of rape or to punish them for seeking protection, self-care, or reproductive health care including abortion care.

55.     IIA has provided direct assistance or financial assistance for pregnant minors seeking abortion care, with awareness that the pregnant minor's parents do not know about the minor's intent to seek abortion care. In some instances where it is providing assistance, IIA knows, or has reason to believe, that a parent or sibling or other close relative is the perpetrator of the sexual violence that caused the minor to become pregnant. In some instances where it is providing assistance, IIA knows, or has reason to believe, that a person of authority such as a law enforcement officer, or teacher, or coach, etc., is the perpetrator of the sexual violence that caused the minor to become pregnant. Thus, in these instances, IIA believes it is unsafe and harmful to the pregnant minor to disclose information to the pregnant minor's parent or guardian.

56.     Plaintiff IIA is driven by their desire to serve the storied culture of their people through trust-based mutual care and aid, which includes ensuring access to abortions, including access for minors. All of their words and actions are in furtherance of these beliefs.

57.     All Plaintiffs support and aid pregnant minors at a difficult time in their lives. They lend their support, time, and money, so that young people can make informed decisions—based on accurate information—without judgment and without concern that they or their families may lack the resources to carry out the decisions those young people wish to make. Plaintiffs provide this assistance at moments when time is of the essence, and when young people might feel they have nowhere to turn for a host of complicated and deeply personal reasons.

**D.     THE U.S. CONSTITUTION REQUIRES THAT CRIMINAL STATUTES PROVIDE ADEQUATE NOTICE OF WHAT CONDUCT IS PROHIBITED.**

58.     The United States Constitution's guarantee of due process requires that the Plaintiffs have fair notice of which activities are lawful and which activities may put them within

the crosshairs of law enforcement. It violates due process to force Plaintiffs to operate in a regulatory framework that is so standardless that it invites arbitrary enforcement and chills lawful conduct.

59.     The government violates the Fourteenth Amendment's due process guarantee by taking a person's life, liberty, or property under a criminal law that is so vague that it "fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595-96 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)). A criminal statute violates the "fair notice" requirement if it fails to give a person of ordinary intelligence fair notice that her contemplated conduct is forbidden by the statute. *United States v. Adams*, 343 F.3d 1024, 1035 (9th Cir. 2003); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972).

60.     Idaho Code § 18-623 lacks clarity, fails to provide fair notice of the conduct it punishes, and invites arbitrary enforcement. It is vague both in scope and effect. Under the present statute, adults who have been helping and mentoring youth will now be in the precarious position of navigating a confusing law while trying to help a pregnant minor who has nowhere else to turn and must make a decision in a short period of time.

61.     In the Idaho Legislature's rush to block persons in Idaho from traveling to other states where abortion care is lawful, they have created a statute that makes unclear when lawful mentoring support stops, and unlawful conduct begins. A person of ordinary intelligence must discern what is helpful information regarding abortion for a pregnant minor and what constitutes recruiting; she must determine when an in-person meeting with that

person becomes harboring. And she must hope that the line she draws in her own mind is the same line that law enforcement and prosecutors draw.

62.     The statute purports to make criminal where one "procures" an abortion or "obtains" an abortion-inducing medication, both completed acts, but also purports to prohibit actions that occur well before an abortion takes place such as recruiting, harboring, or transporting. A person of ordinary intelligence would be unable to identify at what point she violates the statute, and at what point ordinary counseling or mentoring a pregnant minor, or traveling with such a minor within Idaho, may cross a line into attempt.[25]

63.     The statute also fails to provide adequate notice regarding what culpability attaches to communication or the lack thereof with a pregnant minor's parents and/or guardians. The statute's intent provision fails to provide adequate notice regarding whether the intent to conceal must be directed at one or more parent, and whether there is an affirmative defense if one parent provided consent but the other did not.

64.     Indeed, although Representative Ehardt and Governor Little described the Abortion Travel Ban as criminalizing an abortion without parental consent, the lack of parental consent is not an element of the offense. Rather, parental consent is only an affirmative defense. Thus, an adult who obtains consent still violates the statute and can assert the defense of parental consent only after the fact.

65.     Even the Idaho legislators who sponsored H.B. 242 are unsure when a violation occurs, or even what constitutes a violation. In an exchange with another state senator at the March 27, 2023 Senate State Affairs Committee hearing, Senator Lakey acknowledged that

---

[25] Idaho Code § 18-306 provides that "[e]very person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof" is punishable for the attempt.

"recruiting, harboring and transporting, those are descriptive words, I guess the court would have to decide if the conduct constitutes one of those three things."

66.     A law that requires *a court* to decide after the fact whether conduct violates the law is not one that puts an ordinary person on notice of what it prohibits.

67.     Plaintiff Matsumoto is unsure of what conduct Idaho Code § 18-623 prohibits. But for the statute's lack of clarity over whether she would be prosecuted, she would assist minors in traveling to Oregon or Washington getting abortions in states where abortion remains legal.

68.     Plaintiffs NWAAF and IIA likewise are unsure of what conduct Idaho Code § 18-623 prohibits. They wish to continue all of their activities that assist pregnant Idaho minors in obtaining abortions in states where abortion is legal but are uncertain whether they will be prosecuted for such actions.

**E.     THE U.S. CONSTITUTION GUARANTEES AND PROTECTS PLAINTIFFS' RIGHT TO TRAVEL FREELY AMONG AND ACROSS STATE BORDERS.**

69.     "[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 901 (1986) (citation omitted). Recognition of the right to travel dates to the earliest period of self-government in the United States, under the Articles of Confederation, Article IV, which guaranteed the right of "free ingress and regress to and from" neighboring states.

70.     A state may not unreasonably burden a person's right to (1) enter and leave that state, (2) be treated fairly when temporarily present in another state, or (3) be treated the same as other citizens of a state when moving there permanently. *Saenz v. Roe*, 526 U.S. 489, 500 (1999). At issue here is the ability to enter and leave the state.

71.     Plaintiffs are having their rights to interstate and intrastate travel infringed in two ways by the Abortion Travel Ban. First, the vagueness of the statute impermissibly chills their

right to travel. Second, any interpretation of the statute facially deprives them of their right to travel.

72.     As described above, Plaintiffs need to know what is prohibited by this law so that they can comply with it. The law is so uncertain that Plaintiffs cannot tell if it is criminal to operate a motor vehicle on the streets and highways of Idaho because a pregnant minor is in the car, and Plaintiffs' own rights to travel are implicated and effectively chilled.

73.     Any of the many interpretations of the Abortion Travel Ban imposes a clear government action intended to stop travel to another state of both the young person and an adult. The state may not constitutionally ban the use of its roads and highways for the purpose of preventing people from exercising their constitutional rights, particularly when that travel is to exercise lawful rights in other states.

74.     Idaho Code § 18-623 applies to every foot of highway and street in Idaho, making this ban necessarily an interstate travel ban, as it prevents Plaintiffs and pregnant minors from traveling within Idaho to reach a state where abortion is lawful.

75.     The legislative history shows that impeding travel is the primary objective of Idaho Code § 18-623. Governor Little repeatedly referred to H.B. 242 as criminalizing interstate travel to access abortion services. Idaho legislators also made it clear that the purpose of this bill is to criminalize "putting a pregnant person in your car and travelling up to the border."

76.     This right to travel is not only a right to travel interstate but a recognized right to travel intrastate, sometime referred to as the right to movement. Of the four circuits that have squarely decided cases about the right to intrastate travel, three have recognized such a right.[26] The

---

[26] *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646 (2d Cir. 1971); *Selevan v. New York Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009); *Spencer v. Casavilla*, 903 F.2d 171 (2d Cir. 1990);

Idaho Supreme Court has also recognized the right to operate a motor vehicle on public streets and highways as constitutionally protected. *Adams v. City of Pocatello*, 416 P.2d 46, 48 (1966).

77.     Idaho legislators who supported H.B. 242 made clear that their objective is to punish lawful activity outside of Idaho by criminalizing the routine act of travel within Idaho's borders. Senator Lakey made clear that H.B. 242 targets *intrastate* conduct. "We have the authority and the obligation and the opportunity to establish criminal laws in Idaho, . . . [i]t doesn't happen when they cross the state line. It happens when they take the furtherance and act in this capacity to facilitate and procure an abortion, and then get that minor to travel within the state to pursue that abortion."[27]

78.     Senator Lakey confirmed that position in an exchange with another senator at the March 27, 2023 Senate State Affairs Committee hearing:

> Sen. James Ruchti: Thank you Mr. Chairman and Senator Lakey, I'm, I'm just fascinated by this concept of making unlawful the travel across state lines. Because we, we do have an act in the travel to state that's legal, in Idaho it's illegal, could the prohibition on travel across state lines to obtain services that are illegal in the travel to state, but legal, excuse me, illegal in Idaho, but legal in the travel to state be used in other areas like purchasing marijuana for example?
>
> Sen. Todd Lakey: Mr. Chairman and Senator Ruchti, let me make sure we're clear, on lines 19 and 20, we're talking about the recruiting, harboring, or transporting for the attempt to procure or in the furtherance of the procurement

---

*Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2003); *Lutz v. City of York, Pa.*, 899 F.2d 255 (3d Cir. 1990); *Wardwell v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*, 529 F.2d 625 (6th Cir. 1976); *Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002); *Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016); *D.L. v. Unified Sch. Dist. No. 497*, 596 F.3d 768 (10th Cir. 2010) (finding no right); *McCraw v. City of Oklahoma City*, 973 F.3d 1057 (10th Cir. 2020) (finding no right). The Ninth Circuit has yet to decide whether there is such a right. *Potter v. City of Lacey*, 46 F.4th 787 (9th Cir. 2022); *Nunez by Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997). The Plaintiffs in this case ask this Court to recognize this right and find it infringed by the Abortion Travel Ban.

[27] Kelcie Moseley-Morris, *Nation's First Interstate Abortion Ban Bill Awaits Idaho Governor's Signature*, Idaho Capital Sun (Mar. 30, 2023), https://idahocapitalsun.com/2023/03/30/nations-first-interstate-abortion-ban-bill-awaits-idaho-governors-signature/.

of an abortion unlawful in Idaho. But, it, it, it's the activity that occurs within the state, not the transport across state lines. That's um, it, it says transporting the pregnant minor within the state commits the crime. So it's not the across state lines portion. And what we're saying is, abortion is illegal in Idaho, if you're furthering that, without the knowledge of the parents, then that conduct is illegal.

Sen. James Ruchti: Thank you Mr. Chairman and Senator Lakey, but that's what fascinates me. Is because, in putting a pregnant person in your car and travelling up to the border, you haven't committed a crime at all, there's no crime that's been committed, so how is that made illegal?

Sen. Todd Lakey: Mr. Chairman and Senator Ruchti, as a legislature, we define what crimes are in Idaho, so in this case, we are saying that conduct constitutes a crime.

Sen. James Ruchti: And so, by that same reasoning, if you put somebody in your car with the intent of heading to Oregon to go purchase marijuana, we, the state legislature, under this reasoning, could make traveling from Boise to the border illegal?

Sen. Todd Lakey: Mr. Chairman and Senator Ruchti, yes, if we decide to go down that road.

Mar. 27, 2023 Meeting of Senate State Affairs Committee, Audio/Video recording at 0:34:17 - 0:36:44; https://lso.legislature.idaho.gov/MediaPub/2023/AgendaMinutes/230327_ssta_0800AM-Minutes.pdf.

79.     Idaho Code § 18-623 is nothing more than the Idaho Legislature preventing minors from accessing abortion care that is legal in Idaho's neighbor states by criminalizing a trusted adult's travel. The age of consent to get an abortion in Oregon is 15, and a minor can get an abortion without parental consent in Washington.

80.     Even worse, Idaho Code § 18-623 raises the specter of an enforcement scheme that targets "attempt" conduct and casts a wide net, including traffic stops of reproductive age female minors, in an effort to stop pregnant minors traveling to another state from even reaching the border.

81.     For Plaintiffs and others similarly situated who seek to travel through Idaho and across state lines to assist pregnant minors in receiving lawful abortion care in neighboring states,

their own right to travel is infringed. They are prohibited from traveling to engage in lawful conduct in another state.

## F.   THE U.S. CONSTITUTION PROTECTS PLAINTIFFS' RIGHTS TO FREELY ASSOCIATE, SPEAK, AND FUND OTHERS' TRAVEL ACROSS STATE BORDERS.

82.     Plaintiffs have First Amendment rights to associate freely with each other and with pregnant Idahoans, to provide information, and to engage in expressive conduct, including providing funding or practical support for pregnant Idahoans traveling to access out-of-state services that are legal where rendered, including abortion. U.S. Const. amends. I, XIV; *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1193 (9th Cir. 2018).

83.     Pregnant Idahoans, including those who seek Plaintiffs' assistance, have constitutional rights to receive information from Plaintiffs and to travel to states where full reproductive health care—including abortions—is legal.

84.     Plaintiff NWAAF's and Plaintiff IIA's use of funds in furtherance of their missions is considered speech and is protected by the First Amendment.

85.     All Plaintiffs' provision of information regarding abortion access to pregnant persons in Idaho, including pregnant minors, is likewise speech and is protected by the First Amendment. *See Bigelow v. Virginia*, 421 U.S. 809, 824-25 (1975). Idaho Code § 18-623 infringes on these rights by criminalizing speech about lawful activity.

86.     Charitable donations are a protected form of freedom of speech and association under the First Amendment. Organizations and their donors have a strong privacy interest in their affiliation—including the funding relationship—that is grounded in the First Amendment.

87.     A law that subjects donors or volunteers to prosecution on the basis of their exercise of First Amendment rights (such as donating funds and/or time to a charitable organization)

violates the First Amendment, even if the organization itself were accused of illegal activity. *Elfbrandt v. Russell*, 384 U.S. 11, 17 (1966).

88.     To the extent Idaho Code § 18-623's prohibition on "procuring" or "obtaining" an abortion by "recruiting, harboring, or transporting" encompasses activities funded by Plaintiffs' donors, Idaho Code § 18-623 infringes on the donors' First Amendment rights.

89.     Idaho Code § 18-623 criminalizes only speech that supports those seeking abortion care. Under the First Amendment, the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Aschcroft v. ACLU*, 535 U.S. 564, 573 (2002)).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Idaho Code § 18-623 Is Unconstitutionally Void for Vagueness)

90.     Paragraphs 1 through 89 are realleged and incorporated as if fully set forth herein.

91.     The Fourteenth Amendment to the United States Constitution prohibits a state from depriving a person of property without due process of law.

92.     A criminal law that is so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement, violates due process.

93.     Idaho Code § 18-623 is unconstitutionally vague because it lacks clarity, fails to provide fair notice of the conduct it punishes, and invites arbitrary enforcement.

94.     Idaho Code § 18-623 prohibits "recruiting" and "harboring," but Plaintiffs Matsumoto, NWAAF, and IIA are unable to determine under these vague terms where lawful mentoring support stops, and unlawful conduct begins.

95.     Plaintiffs Matsumoto, NWAAF, and IIA are unable to determine what is helpful information regarding abortion for a pregnant minor and what constitutes recruiting. They

cannot tell what conversations with a pregnant minor are permissible, and what conversations violate the statute. If Plaintiffs inform a pregnant minor that the Planned Parenthood clinic in Ontario provides abortion services, are they recruiting?

96.     Plaintiffs Matsumoto, NWAAF, and IIA are unable to determine when an in-person meeting with a pregnant person becomes harboring, particularly if that in-person meeting occurs relatively near an Idaho border.

97.     Idaho Code § 18-623 criminalizes conduct by an adult acting with the "intent to conceal" the abortion from a pregnant minor's "parents or guardian." Plaintiffs Matsumoto, NWAAF, and IIA are unable to determine what contact, lack of contact, communication, or lack of communication, with a pregnant minor's parent, parents, or guardian constitutes an intent to conceal, nor whether that communication must be with all parents and guardians.

98.     Idaho Code § 18-623 also provides an affirmative defense if a "parent or guardian . . . consented to [the] trafficking." Plaintiffs Matsumoto, NWAAF, and IIA are unable to determine what contact, lack of contact, communication, or lack of communication, with a pregnant minor's parent, parents, or guardian constitutes an affirmative defense, whether that communication must be with a single parent or guardian, and to what activity the parent or guardian must consent.

99.     For these reasons, Idaho Code § 18-623 is vague both in scope and effect and deprives Plaintiffs of their due process rights under the United States Constitution.

100.    The Abortion Travel Ban is enforced by Defendant under color of state law.

101.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding temporary, preliminary, and permanent injunctive relief, declaratory relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## SECOND CLAIM FOR RELIEF
### (Infringement on the Fundamental Right to Interstate Travel)

102.    Paragraphs 1 through 101 are realleged and incorporated as if fully set forth herein.

103.    The right to travel is protected by the Constitution. *Saenz*, 526 U.S. at 503. Specifically, the constitutional right to travel "protects the right of a citizen of one State to enter and to leave another State." *Id.* at 500. This includes "the right to go from one place to another, including the right to cross state borders while en route." *Id.* (citing *Edwards v. California*, 314 U.S. 160 (1941)).

104.    A state may not unreasonably burden a person's right to enter and leave that state. *Id.* at 499. Free interstate migration is vital and fundamental to transform "many States into a single Nation." *Soto-Lopez*, 476 U.S. at 902–03.

105.    The Abortion Travel Ban unreasonably burdens Plaintiffs' right to enter and leave a state.

106.    The intent behind the passage of the Abortion Travel Ban was to impermissibly restrict the travel of both Plaintiffs and the pregnant minors they serve.

107.    The Abortion Travel Ban deters travel, including the travel of the Plaintiffs who seek to assist pregnant minors.

108.    Plaintiffs seek to continue helping pregnant minors in Idaho travel out of state for lawful abortions but face an imminent threat of prosecution under the Abortion Travel Ban. They fear prosecution for traveling with a pregnant minor from Idaho into another state.

109.    Plaintiffs' lawful and constitutionally protected conduct has been chilled by the passage of the Abortion Travel Ban, as described herein.

110.    The Abortion Travel Ban is enforced by Defendant under color of state law.

111.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding injunctive relief, declaratory relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

### THIRD CLAIM FOR RELIEF
### (Infringement on the Fundamental Right to Intrastate Travel)

112.    Paragraphs 1 through 111 are realleged and incorporated as if fully set forth herein.

113.    The right to travel within a state is no less fundamental than the right to travel between the states. Intrastate travel "is an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function." *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002).

114.    This right is sometimes described interchangeably as freedom of movement, the right to travel freely on public fora, and right to intrastate travel. "Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. . . . It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." *Kent v. Dulles*, 357 U.S. 116, 126 (1958).

115.    The Abortion Travel Ban unreasonably burdens Plaintiffs' right to intrastate travel, and that right for the pregnant minors they serve. The Abortion Travel Ban also violates Plaintiffs' right, as recognized by the Idaho Supreme Court, to operate a motor vehicle on public roads and highways.

116.    The intent behind the passage of the Abortion Travel Ban is to impermissibly restrict the travel, including travel within the State of Idaho, of both Plaintiffs and the pregnant minors they serve.

117.    The Abortion Travel Ban deters travel, including travel within the State of Idaho, by Plaintiffs who seek to assist pregnant minors.

118.    Plaintiffs seek to continue helping pregnant minors in Idaho travel out of state for lawful abortions but face an imminent threat of prosecution under the Abortion Travel Ban and cannot safely do so without relief from this Court. In order to travel out of state, Plaintiffs must travel freely in state.

119.    Plaintiffs' lawful and constitutionally protected conduct has been chilled by the passage of the Abortion Travel Ban, as described herein.

120.    The Abortion Travel Ban is enforced by Defendant under color of state law.

121.    Accordingly, Plaintiffs are entitled to a declaratory judgment awarding injunctive relief, declaratory relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

**FOURTH CLAIM FOR RELIEF**
**(Infringement on First Amendment Rights)**

122.    Paragraphs 1 through 121 are realleged and incorporated as if fully set forth herein.

123.    The First Amendment to the United States Constitution guarantees its citizens the rights to free speech, assembly, association, and petition. U.S. Const. amend. I.

124.    The U.S. Constitution does not permit Idaho to bar providing information regarding conduct legal in another state just because it is illegal in this one. All Plaintiffs wish to provide information on conduct legal in other states. Banning speech on the basis of a legal intended purpose is a violation of all Plaintiffs' free speech rights.

125.    The U.S. Constitution does not permit Idaho to prohibit funding or other practical support for Idahoans seeking to undertake legal conduct in another state. Plaintiffs IIA and NWAAF's use of funds is protected speech. Banning the use of funds on the basis of a legal intended purpose is a violation of Plaintiffs' free speech rights.

126.    Idaho Code § 18-623 infringes on all Plaintiffs' rights to associate freely with each other and with pregnant Idahoans and to engage in expressive conduct, including providing funding or practical support for pregnant Idahoans traveling to access out-of-state services that are legal where rendered, including abortion.

127.    Idaho Code § 18-623 has a chilling impact on all Plaintiffs' behavior.

128.    Idaho Code § 18-623 has and will continue to have a chilling impact on Plaintiffs NWAAF and IIA's ability to uphold their missions. It may also undermine their relationships with donors and members and their ability to recruit and retain volunteers.

129.    Idaho Code § 18-623 further infringes on Plaintiffs' First Amendment free speech right to provide to pregnant persons in Idaho, including pregnant minors, information regarding abortion access in states where it is legal.

130.    Idaho Code § 18-623 targets the content of Plaintiffs' speech, criminalizing speech and expressive conduct that is about only one specific type of reproductive health care, therefore it is a content or viewpoint based prohibition.

131.    The Abortion Travel Ban is enforced by Defendant under color of state law.

132.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding temporary, preliminary, and permanent injunctive relief, declaratory relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## IV. PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment in their favor and against Defendant Labrador:

1.      Declaratory judgment relief:

      a.      That the Abortion Travel Ban, Idaho Code § 18-623, is unconstitutional under the First Amendment;

      b.      That the Abortion Travel Ban, Idaho Code § 18-623, is unconstitutionally vague;

c.     That the Abortion Travel Ban, Idaho Code § 18-623, is an unconstitutional infringement on the right to interstate travel;

d.     That Idahoans have a protected right to intrastate travel and that the Abortion Travel Ban, Idaho Code § 18-623, unconstitutionally infringes on that right;

e.     That enforcement of the Abortion Travel Ban, Idaho Code § 18-623, against any of the Plaintiffs or any of their agents, board members, staff, or volunteers, for speech or other expressive conduct with minors related to the provision of legal abortion services regardless of parental consent, is unconstitutional, including but not limited to:

     i.     Counseling about legal abortion services;

     ii.     Informing about legal abortion services;

     iii.     Recommending legal abortion services;

     iv.     Informing about legal abortion providers;

     v.     Informing about sources of funding, travel, expenses and accommodations in or outside of Idaho related to legal abortion services;

f.     That enforcement of the Abortion Travel Ban, Idaho Code § 18-623, against any of the Plaintiffs or any of their agents, board members, staff, or volunteers, for providing transport services or any other support to minors related to the provision of legal abortion services is unconstitutional, regardless of parental consent, including but not limited to:

     i.     Funding or otherwise financially supporting such transport;

     ii.     Driving or otherwise traveling in order to seek abortion services where such services are legal;

     iii.     Housing or otherwise helping to effectuate travel in order to access abortion services where such services are legal.

2.     Enjoining Attorney General Raúl Labrador from enforcing Idaho Code § 18-623.

3.     Reasonable attorneys' fees and costs.

4.     Any other relief that the Court deems just and proper.

DATED: July 11, 2023.

STOEL RIVES LLP


/s/ Wendy J. Olson
Wendy J. Olson


LEGAL VOICE


/s/ Wendy S. Heipt
Wendy S. Heipt
Kelly O'Neill

THE LAWYERING PROJECT


/s/ Jamila A. Johnson
Jamila A. Johnson
Paige Suelzle


*Attorneys for Plaintiffs*